1

2

3

4

5

6

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

7

8

9

10

11

12

13

E. R., a minor child by and through his
guardian, PERLA CALDERON,

Claimant,

v.

Commissioner of Social Security,

Defendant.

No. 1:21-cv-01578-GSA

**ORDER DIRECTING ENTRY OF
JUDGMENT IN FAVOR OF DEFENDANT
COMMISSIONER OF SOCIAL SECURITY
AND AGAINST CLAIMANT**

**(Doc. 20, 22)**

14

## I.      Introduction

15

16

17

18

19

Claimant E.R., a minor child by and through his guardian, Perla Calderon, ("Claimant")
seeks judicial review[1] of a final decision of the Commissioner of Social Security ("Commissioner"
or "Defendant") denying his application for supplemental security income (SSI) pursuant to Title
XVI of the Social Security Act.  Because substantial evidence and applicable law support the ALJ's
decision, the decision will be affirmed.

20

## II.      Factual and Procedural Background

21

22

23

24

25

On January 31, 2019, Claimant applied for SSI.  The Commissioner denied the application
initially on April 16, 2019, and on reconsideration on August 22, 2019.  AR 86, 93.  A hearing was
held before an Administrative Law Judge (the "ALJ") on December 2, 2020.  AR 32–63.  On
December 28, 2020, the ALJ issued an unfavorable decision.  AR 17–31.  The Appeals Council
denied review on August 18, 2021 (AR 1–6), and this appeal followed.

26

## III.      The Disability Standard Generally

27

28

Pursuant to 42 U.S.C. §405(g), this court has the authority to review a decision by the

---

[1] The parties consented to the jurisdiction of a United States Magistrate Judge.  Doc. 7, 24.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Commissioner denying a claimant disability benefits.   "This court may set aside the Commissioner's denial of disability insurance benefits when the ALJ's findings are based on legal error or are not supported by substantial evidence in the record as a whole." *Tackett v. Apfel*, 180 F.3d 1094, 1097 (9th Cir. 1999) (citations omitted).  Substantial evidence is evidence within the record that could lead a reasonable mind to accept a conclusion regarding disability status.  *See Richardson v. Perales*, 402 U.S. 389, 401 (1971).  It is more than a scintilla, but less than a preponderance.  *See Saelee v. Chater*, 94 F.3d 520, 522 (9th Cir. 1996) (internal citation omitted).

When performing this analysis, the court must "consider the entire record as a whole and may not affirm simply by isolating a specific quantum of supporting evidence." *Robbins v. Social Security Admin.*, 466 F.3d 880, 882 (9th Cir. 2006) (citations and quotations omitted).  If the evidence could reasonably support two conclusions, the court "may not substitute its judgment for that of the Commissioner" and must affirm the decision.  *Jamerson v. Chater*, 112 F.3d 1064, 1066 (9th Cir. 1997) (citation omitted).  "[T]he court will not reverse an ALJ's decision for harmless error, which exists when it is clear from the record that the ALJ's error was inconsequential to the ultimate nondisability determination." *Tommasetti v. Astrue*, 533 F.3d 1035, 1038 (9th Cir. 2008).

> To qualify for benefits under the Social Security Act, a Claimant must establish that he or she is unable to engage in substantial gainful activity due to a medically determinable physical or mental impairment that has lasted or can be expected to last for a continuous period of not less than twelve months.  42 U.S.C. § 1382c(a)(3)(A).  An individual shall be considered to have a disability only if . . . his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work, but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. §1382c(a)(3)(B).

**IV.   Childhood Disability Standard**

Pursuant to 20 C.F.R. § 416.906:

> If you are under age 18, we will consider you disabled if you have a medically determinable physical or mental impairment or combination of impairments that causes marked and severe functional limitations, and that can be expected to cause death or that has lasted or can be expected to last for a continuous period of not less

1

2

3

4

than 12 months. Notwithstanding the preceding sentence, if you file a new application for benefits and you are engaging in substantial gainful activity, we will not consider you disabled. We discuss our rules for determining disability in children who file new applications in §§ 416.924 through 416.924b and §§ 416.925 through 416.926a.

5

6

7

8

9

A three-step sequential evaluation applies: 1) is the child engaged in substantial gainful activity (if so, s/he is not disabled); 2) does the child have a severe impairment(s) (i.e. more than a slight abnormality with more than minimal functional impact) (if not, s/he is not disabled); and, 3) does the child's impairment(s) meet, medically equal, or functionally equal a Listing[2] (if not, s/he is not disabled). 20 C.F.R. § 416.924(b)-(d).

10

### V.      The ALJ's Decision

11

12

At step one the ALJ found that Claimant had not engaged in substantial gainful activity since the application date of January 31, 2019.  AR 21.

13

14

15

16

At step two the ALJ found that Claimant had the following severe impairments: attention deficit hyperactivity disorder (ADHD) and oppositional defiant disorder (ODD).  AR 21.  At step two the ALJ found that Claimant also had the following non-severe impairments: hemolytic anemia, asthma, and obesity.  AR 21.

17

18

19

20

21

At step three the ALJ found that Claimant did not have an impairment or combination thereof that met or medically equaled the severity of one of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1.  AR 21.  The ALJ also determined that Claimant did not have an impairment or combination thereof that functionally equaled the severity of the listings.  AR 22–26.

22

23

Accordingly, the ALJ concluded that Claimant was not disabled since his application date of January 31, 2019.  AR 26.

24

### VI.      Issues Presented

25

26

27

Claimant asserts two claims of error: 1- the ALJ erred in rejecting the opinion of Claimant's teacher, Ms. Sierra, which established marked limitations in two domains and thus satisfied listing level functional equivalence, and 2- the ALJ failed to properly consider the subjective reports

28

---

[2] 20 C.F.R. pt. 404, subpt. P, App. 1

1

2

concerning the intensity, persistence, and limiting effects of symptoms.  MSJ. at 8–14, Doc. 20.

### A.      Functional Equivalence: Ms. Sierra's Opinion

3

4

#### 1.      Applicable Law

5

Pursuant to 20 C.F.R. § 416.926a(a), to determine whether a child's impairment(s)

6

functionally equal a listing, the agency assesses the child's functioning in six domains:

7

8

9

10

(i) Acquiring and using information;
(ii) Attending and completing tasks;
(iii) Interacting and relating with others;
(iv) Moving about and manipulating objects;
(v) Caring for yourself; and,
(vi) Health and physical well-being.

11

An impairment or combination of impairments functionally equals a listed impairment if it

12

results in "marked" limitations in two domains of functioning, or an "extreme" limitation in one domain.

13

See 20 C.F.R. § 416.926a(a), (d).

14

A child has a "marked" limitation in a domain when the impairment(s) interferes <u>seriously</u> with

15

16

the ability to independently initiate, sustain, or complete activities. 20 C.F.R. § 416.926a(e)(2).  A child

17

has an "extreme" limitation in a domain when the impairment(s) interferes <u>very seriously</u> with the

18

ability to independently initiate, sustain, or complete activities.

19

When determining functional equivalence the agency evaluates the "whole child," by

20

considering how the claimant functions at home, at school, and in the community; the interactive and

21

cumulative effects of all of the claimant's medically determinable impairments on the claimant's

22

activities; and the type, extent, and frequency of help the claimant needs.  SSR 09-1p.

23

The agency considers statements from medical and non-medical sources when evaluating

24

functional equivalence, including opinions from schoolteachers if the child is in school.  20 C.F.R.

25

26

§ 416.924a(a)(2)(iii). An ALJ may reject the opinions of non-medical sources by giving "reasons

27

germane to each witness for doing so." *Molina v. Astrue*, 674 F.3d 1104, 1111 (9th Cir. 2012),

28

superseded by regulation on other grounds; *Turner v. Comm'r of Soc. Sec. Admin.*, 613 F.3d 1217,

4

1

1224 (9th Cir. 2010).

2

### 2.   Analysis

3

#### a.   ALJ's Findings about the Six Domains

4

5

As to the six domains considered in the functional equivalence analysis, the ALJ found that

6

Claimant has the following limitations:

7

• <u>less than a marked</u> limitation in acquiring and using information;

8

• <u>less than a marked</u> limitation in attending and completing tasks;
• <u>less than a marked</u> limitation in interacting and relating with others;

9

• no limitation in moving about and manipulating objects;
• no limitation in the ability to care for himself/herself; and

10

• no limitation in health and physical well-being.

11

AR 23.

12

#### b.   Ms. Sierra's Opinion

13

14

Claimant's second grade teacher, Leticia Sierra, completed a pre-printed SSA form (the

15

"Teacher Questionnaire") dated March 27, 2019.  AR 234–43.  Ms. Sierra indicated she knew

16

Claimant for 7 months and spent 7 hours per day with him on school days.  The form asks the

17

teacher to evaluate various functions and activities under each of the 6 domains on a scale ranging

18

from 1 to 5, with a score of 4 denoting a "serious problem" (i.e., a marked limitation per 20 C.F.R.

19

§ 416.926a(e)), and a score of 5 denoting a "very serious" problem (i.e., an extreme limitation per

20

20 C.F.R. § 416.926a(e)).

21

As to the first domain, acquiring and using information, Ms. Sierra selected scores ranging

22

from 1 to 3.

23

24

As to the second domain, attending and completing tasks, Ms. Sierra selected a score of 4 with

25

respect to 6 activities including: focusing long enough to finish assigned tasks, waiting to take turns,

26

completing class/homework assignments, completing work carefully without careless mistakes,

27

working without distracting self or others, and working at a reasonable pace/finishing on time.  AR 236.

28

Ms. Sierra explained that Claimant has a really hard time focusing to complete assignments and he does

not complete assignments on paper.  AR 236.  With respect to this domain, at the end of the questionnaire, Ms. Sierra noted that after a medication increase Claimant was able to focus more.  AR 241.

As to the third domain, interacting and relating with others, Ms. Sierra selected a score of 4 with respect to the following activities: playing cooperatively with other children, making and keeping friends, seeking attention appropriately, expressing anger appropriately, and following rules (classroom, games, sports).  AR 237.  Ms. Sierra explained that Claimant often visits the vice principal's office for hitting during recess, and when working with other students he constantly gets upset if the activity does not go his way.  With respect to this domain, Ms. Sierra noted at the end of the questionnaire that after a medication increase he had less issues during recess.  AR 241.

As to the fourth domain, moving and manipulating objects, Ms. Sierra identified no limitations.  AR 238.

As to the fifth domain, ability to care for self, Ms. Sierra opined Claimant had a score of 4 as to handling frustration appropriately, but less than 4 in the remaining 9 activities which comprised this domain.  Ms. Sierra explained that "when in frustration, student will cry or act with aggression toward other students."  AR 239.

As to the sixth domain, health and physical well-being, Ms. Sierra identified no limitations.

#### c.      ALJ's Reasoning for Discounting Ms. Sierra's Opinion

Claimant contends the ALJ failed to explain his reasoning for rejecting Ms. Sierra's opinion.  Defendant responds at length that the revised regulations only require an ALJ to consider, but not to articulate, how the opinion of a non-medical source was considered, and that any judicially created doctrines suggesting otherwise are irrelevant.   Resp. at 5-8, Doc. 22 (citing 20 C.F.R. § 416.920c(d)).  Claimant did appear to initially concede the distinction between consideration and articulation, but subsequently argued an articulation standard.  *Compare* MSJ at 9, ("While 20

1
2
3
4
5

C.F.R. §§ 404.1520c(d), 416.920c(d), states that the ALJ is not required to articulate how he or she considered evidence from nonmedical sources . . .", *with* MSJ at 11, "The ALJ merely summarized Ms. Sierra's opinion in conjunction with other evidence, but failed to articulate any germane reason for discrediting her assessment."

6
7
8

Notwithstanding, at issue is the sufficiency of the ALJ's reasoning for finding less than marked limitations in the functional domains set forth at 20 C.F.R. § 416.926a. Here, Claimant specifically addresses the purportedly marked limitations in the second and third domains.

9

### i.  Domain Two: Attending and Completing Tasks

10
11

As to the second domain, the ALJ explained as follows:

12
13
14
15

Concerning attending and completing tasks, the claimant's teacher stated he has difficulty focusing to complete assignments (5E/3). She further stated he can verbally explain assignments but does not complete them on paper (Id.). As mentioned above, his teacher stated he is able to focus more after his medication was increased (5E/8). The claimant's vice principal indicated he has difficulty attending and completing tasks when he is not on medication and that medication helps (8E/3).

16
17
18
19

Though Ms. Sierra did not identify the specific dosage increase in question, the record reflects the Adderall dosage was increased from 5 to 10mg on January 24, 2019.[3]  AR 359.  Ms. Sierra completed the questionnaire two months later, on March 26, 2019.  AR 234–43.

20
21

As to Ms. Sierra's statement that he was able to focus more after his medication increase, Claimant disputes the ALJ's implicit speculation that the medication increase resulted in a greater

22

23
24
25
26
27
28

[3] Claimant was initially prescribed Adderall XR 5mg on or about March 21, 2018, by Dr. Wendt.  AR 331.  Claimant was continued on that dose in November 2018.  AR 316-17; 557.  On January 24, 2019, the dosage was increased to 10mg and Claimant was instructed to take it after a meal as he had previously skipped doses due to stomach aches.  AR 357–359.  On October 24, 2019, the dosage was increased to 15mg XR.  AR 473.  On November 4, 2019, Guanfacine 1mg BID was added and it appears that dose was continued thereafter.  AR 464, 447, 430.  On May 21, 2020, the dosage was increased to 20mg XR.  AR 310.  Prior to the dosage increase from 5 to 10mg, the record indicates Claimant "refuses many days" even his 5mg dose due to stomach upset before his doctor advised that he take it with a meal as opposed to on an empty stomach.  AR 309, 356.  Thus, up until roughly the date of his claim (January 31, 2019), Claimant was taking 5mg of Adderall (if at all).  To the extent Ms. Sierra's opinion suggests worsening functioning before then, any earlier period of worse functioning would not be compensable as SSI claims, unlike SSDI claims, are not retroactive to the date of disability onset, but are effective only once filed.  20 C.F.R. §§ 404.621, 416.335.

1
2
3
4
5
6
7

ability to focus than what Ms. Sierra identified on the questionnaire.  Rather, Claimant contends

that the improved ability to focus would already be accounted for in the questionnaire responses,

and the improvement was apparently not sufficient to resolve his serious/marked (level 4/5)

limitations in this area.  To conclude otherwise, Claimant asserts, is to suggest that Ms. Sierra

"deliberately offered an opinion of functioning that was no longer accurate following a medication

increase."  MSJ at 10.[4]

8
9
10
11
12
13
14
15
16
17
18
19
20
21

However, to arrive at a more accurate interpretation of Ms. Sierra's opinion, the opinion needs

to be considered in the context of the questionnaire as a whole and the order in which the questions

were presented.    Here, the questionnaire first asks the teacher about the duration and frequency of

her contact with the claimant. As his 2nd grade teacher, she responded she had known him for 7

months, 7 hours per day on weekdays.  AR 234.  The teacher is then asked to score his functioning

in the 6 domains.  AR 235–240.  Finally, at the conclusion of the form under "additional comments"

the form states, "Use this section for continuation of any previous sections.  You may also use this

section for any additional remarks <u>or to note if there have been any changes in the child's</u>

<u>functioning, for better or worse, that you would like to address.</u>" (AR 241) (emphasis added).  Thus,

it is not until the very end of the questionnaire that the teacher is prompted to reflect on any changes

in functioning during the period she had known the claimant.  Ms. Sierra then noted his focus had

improved since his medication increase.

22
23
24
25

A reasonable interpretation is that Ms. Sierra simply scored Claimant's functioning based

on the entirety of her 7 months with him as his 2nd-grade teacher.  Then, once prompted in the final

question to reflect and comment on any changes, she noted there was a change for the better

26
27
28

[4] In response, Defendant simply repeats the ALJ's reasoning concerning the efficacy of the medication increase and concludes that this was a sufficient reason. In addition, Defendant blurs the distinction between the ALJ's reasoning in support of the first domain which is not at issue (acquiring and using information), with the second domain which is at issue (attending and completing tasks).   Defendant does not squarely address Claimant's contention that Ms. Sierra's comment concerning improved focus after medication increase was already reflected in the scores which, according to Claimant, denoted serious/marked limitations.

1
2      following his medication increase.

3            Further, improvement aside, the scores as reported do not establish marked limitations of

4      level 4 out of 5 in any domain, even though she selected a score of 4 out of 5 for certain activities

5      within a domain.  Importantly, the questionnaire **does not ask** for one score for each domain.

6      Rather, there were up to 13 activities listed under each of the 6 domains and the teacher selects a

7      score of 1 to 5 for each activity within the domain.  As noted in 20 C.F.R. § 416.926a, children are

8      not expected to be able to perform all activities within a domain, and marked limitations in any of

9      the activities related to a domain does not necessarily mean the claimant has overall marked

10     limitations in that domain: [5]

11
12           In paragraphs (g) through (l), we describe each domain in general terms. For most
             of the domains, we also provide examples of activities that illustrate the typical
13           functioning of children in different age groups. For all of the domains, we also
             provide examples of limitations within the domains. However, we recognize that
14           there is a range of development and functioning, and that not all children within an
             age category are expected to be able to do all of the activities in the examples of
15           typical functioning. We also recognize that limitations of any of the activities in the
             examples do not necessarily mean that a child has a "marked" or "extreme"
16           limitation, as defined in paragraph (e) of this section

17           20 C.F.R. § 416.926a(b)(1)(emphasis added)

18
             Ms. Sierra did not uniformly circle scores of 4 or more for all activities within any domain,
19
20     nor did she circle mostly scores of 4 or more in any domain.  Though no precise formula is proposed

21     in the regulations, and the activities listed are only examples, the questionnaire at issue readily

22     lends itself to some basic statistical analysis.  For the second domain of attending and completing

23     tasks, Ms. Sierra did circle a score of 4 for 6 of the 13 activities, but the **average** score across all

24     listed activities was 3.16 per activity which is much closer to a 3, which denotes an "obvious" but

25
26

27     [5] Indeed, under domain number 5 (Caring for Yourself), of the 10 activities listed, Ms. Sierra gave a score of 4 only for
       1 specific activity of "handling frustration appropriately," but she gave a score of 3 or less for the remaining activities
28     or left them blank altogether.  AR 239.  Notably, Claimant does not contend he has a serious/marked limitation in that
       domain, nor would such a contention be justified where only 1 of 10 activities was scored at 4 or higher.

1

2    less than marked limitation, than to a 4 which denotes a serious/marked limitation.  The median

3    score is a 3 out of 5 which does not support an overall level 4 out of 5 (i.e. serious/marked) limitation

4    in the domain.  Any improvement in those scores following a medication increase as noted by Ms.

5    Sierra would arguably only bring the average score further out of range for a serious/marked

6    limitation.

7                                    ii.        **Domain Three: Interacting/Relating With Others**

8            As to the third domain, the ALJ explained as follows:

9
            As for interacting and relating with others, the claimant's teacher stated the
10      claimant visited the vice principal's office for hitting others during recess and he
        constantly gets upset if an activity does not go his way (5E/4). Additionally, the
11      record indicates the claimant threatened to kill a girl with a knife at school, which
        then triggered a visit from law enforcement (7F/123, 143).  However, the claimant's
12      teacher stated he has less issues during recess after his medication was increased
13      (5E/8). Although the claimant's vice principal stated he has difficulty playing
        cooperatively with others as well as making and keeping friends, she also stated the
14      claimant's behavior is worse when he is not a medication (8E/2, 4). Despite some
        problems interacting with others, the record indicates it was not necessary to
15      implement behavior modification strategies (8E/4). Furthermore, although the
16      claimant's mother stated he is "very aggressive and violent with his brothers and
        sisters" and does not have any friends (7E/5), the claimant testified he gets along
17      well with his siblings and has friends. Additionally, the claimant was described as
        "polite," "friendly" and "cooperative" (4F/3, 5F/17). During therapy sessions, the
18      claimant interacted well with providers (5F). In September 2020, the claimant's
        mother reported he has friends (10F/6).
19      AR 25.

20      There are a few problems with this explanation, some of which Claimant emphasizes.  Here,

21   the Vice Principal's observations do not have nearly the evidentiary value of that of Ms. Sierra's.

22
     First, it is not clear how many interactions the Vice Principal had with the claimant other than when
23
     the claimant was sent to the Vice Principal's office for hitting during recess. Secondly, the
24
     improvement the Vice Principal references could simply be based on the observation that claimant
25
     was in fact sent to the office less during recess, which Ms. Sierra noted.
26
27      Importantly however, a similar analysis as explained above also applies with respect to Ms.

28   Sierra's opinion concerning the third functional domain of interacting and relating with others.  Of

                                                    10

the 13 activities listed, Ms. Sierra scored 5 of them as a 4 out of 5, including: playing cooperatively with other children, making and keeping friends, seeking attention appropriately, expressing anger appropriately, and following rules (classroom, games, sports).  AR 237.  The average score was 2.75 out of 5.  The median was a 3 out of 5.  Thus, these scores do not strongly support a serious/marked limitation in this domain.

Ms. Sierra noted in narrative format in the same section that the claimant is often sent to the vice principal's office for hitting during recess, and when working with other students he gets upset if things don't go his way.  At the end of the opinion, Ms. Sierra noted he was having less "issues during recess"[6] following his medication increase. Again, any such improvement would arguably put the scores even further out of range of an overall level 4 out of 5 limitation in this domain.

Claimant emphasizes that on two occasions he threatened to bring a knife to school and stab a classmate, though there is no indication he ever had a knife on the school premises or on his person.  Claimant's mother reported these threats to one of Claimant's psychiatric providers at an October 10, 2018 psychiatric evaluation (AR 365), which indicate that both threats predated the first dosage increase from 5 to 10mg which took place January 24, 2019.  Further, his mother reported that the first of the two knife threats occurred "last year", again suggesting the first of the two threats occurred before or soon after Claimant was initially assessed with ADHD and first prescribed Adderall 5mg on March 21, 2018.  AR 364–65.  Thus, those threats do not have strong relevance to Claimant's social functioning once medicated, nor to his social functioning during the period under review which began on his SSI application filing date of January 31, 2019.  This is true irrespective of worse functioning during earlier periods of time when he was minimally

---

[6] Granted, the issues of hitting children during recess did not account for all of his limitations in this domain.  Thus, the comment about less issues during recess is not a proxy for global improvement in the domain of social interaction.  Nevertheless, several of the activities described in that domain appear related to his issue of hitting during recess, and thus the comment concerning less issues during recess suggests less issues with these specific activities (e.g. "playing cooperatively with other children," and "expressing anger appropriately.")

medicated at 5mg (relative to his ultimate dose of 20mg), or unmedicated altogether.

### iii.     Conclusion concerning Ms. Sierra's Opinion

In sum, up until January 24, 2019, 7 days prior to the filing of his claim, Claimant was taking at most 5mg of Adderall, if at all. Ms. Sierra reported functional improvement with medication increase (ostensibly the first of three medication increases based on the timing of her opinion and the timing of the dose increases, though she did not specify). [7]

The scores as Ms. Sierra reported them, regardless of improvement, would not establish marked limitations (4 out of 5) in the two functional domains at issue.  As the regulations note, not all children can perform all activities within a domain, and a marked limitation in any activity under a domain does not necessarily establish a marked limitation in that domain.  20 C.F.R. § 416.926a(b)(1).  Here, despite several scores of 4 out of 5 in the activities under the two domains at issue, the mean and median scores for the two domains ranged from 2.75 to 3.16, which does not significantly support an overall marked limitation in those domains.

Once again, even a modest improvement by Claimant following medication dosage increases   would arguably put his scores further out of range for marked limitations.

### B.     Subjective   Complaints/Symptomology/Testimony/Credibility   of   the   Claimant and/or his Mother

#### 1.     Applicable Law

The ALJ is responsible for determining credibility, resolving conflicts in medical testimony and resolving ambiguities.  *Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995).  A claimant's statements of pain or other symptoms are not conclusive evidence of a physical or mental

---

[7] Notably, the dosage increase from 5mg to 10mg was followed by a second increase from 10mg to 15mg on October 24, 2019 (AR 473), and then a third increase on May 21, 2020 from 15mg to 20mg (AR 310).  The record indicates, as the ALJ noted, that Claimant did "much better on the higher dose- calm all day and not having disruptive behavior problems," though he "still refuses to do task related to academic learning." (AR 429).

1

2

3

impairment or disability.  42 U.S.C. § 423(d)(5)(A); Soc. Sec. Rul. 16-3p.

An ALJ performs a two-step analysis to determine whether a claimant's testimony regarding subjective pain or symptoms is credible.  *See Garrison v. Colvin*, 759 F.3d 995, 1014 (9th Cir. 2014); *Smolen*, 80 F.3d at 1281; S.S.R 16-3p at 3.  First, the claimant must produce objective medical evidence of an impairment that could reasonably be expected to produce some degree of the symptom or pain alleged.  *Garrison*, 759 F.3d at 1014; *Smolen*, 80 F.3d at 1281–82.  If the claimant satisfies the first step and there is no evidence of malingering, the ALJ must "evaluate the intensity and persistence of [the claimant's] symptoms to determine the extent to which the symptoms limit an individual's ability to perform work-related activities."  S.S.R. 16-3p at 2.

An ALJ's evaluation of a claimant's testimony must be supported by specific, clear and convincing reasons.  *Burrell v. Colvin*, 775 F.3d 1133, 1136 (9th Cir. 2014); *see also* S.S.R. 16-3p at *10.  Subjective testimony "cannot be rejected on the sole ground that it is not fully corroborated by objective medical evidence," but the medical evidence "is still a relevant factor in determining the severity of claimant's pain and its disabling effects."  *Rollins v. Massanari*, 261 F.3d 853, 857 (9th Cir. 2001); S.S.R. 16-3p (citing 20 C.F.R. § 404.1529(c)(2)).

#### 2.      **Analysis**

After summarizing Claimant's <u>mother's</u> testimony, the ALJ found that "the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms, however the allegations concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record."

Claimant thus focuses on his mother's testimony, whereas Defendant contends that "Claimant erroneously attempts to conflate the rules for evaluating lay witness testimony, such as from Claimant's mother, with the rules for evaluating Claimant's own testimony. Claimant's mother is considered a lay witness."  Resp. at 10.  Defendant further explains that "lay witness evidence falls

under evidence from nonmedical sources and per 20 C.F.R. § 416.913(a)(4) ALJs are not required to articulate their findings regarding lay witness testimony."

Notably, the ALJ almost exclusively discussed the claimant's mother's testimony, not the claimants. Absent any authority on point addressing this issue in the context of the childhood disability regulations, which the parties do not identify, it would arguably seem that a 7-to-9-year child[8] has a more limited capacity to reflect on the intensity, persistence, and limiting effects of his behavioral problems as compared to his mother. In any event, at a minimum, his mother's testimony would have at least as much evidentiary value as the claimant's and thus her testimony should not be minimized as simply "lay witness" testimony.

As to what testimony was most impactful, Claimant explains as follows:

> At the hearing, Claimant's mother testified to the following: Claimant has problems doing schoolwork and attending his online classes. Ar. 46. He has two classes online each day, and he sometimes does not attend his afternoon class. Ar. 46. He takes medication, but his report cards still say he is not completing assignments. Ar. 46, 47. He takes medication daily. Ar. 48. She receives frequent messages from Claimant's teachers stating that he did not attend class, did not complete an assignment or topic, or that he is failing something. Ar. 47.
> Medication helped him do "better" in school, because prior to the medications and his IEP, she had to go to the school every day and sit with him at certain times to ensure he was doing his work. Ar. 49. Medications assist his ability to focus but he still has problems with being easily distracted. Ar. 49-50. He also has problems with acting out or fighting with his siblings on a daily basis. Ar. 50. Medications helped "a little bit" with behavioral problems, and therapy helped a little on a temporary basis. Ar. 50-51. He gets angry and shuts down when asked to do chores or help with housework. Ar. 51. She has to get him ready for school in the morning and help dress him or he simply will not do it. Ar. 52-53. He will occasionally have a very good day where does well, and he feels good and proud of himself, but then he goes back to not wanting to do things. Ar. 53.
> Claimant testified that he is attending school from home due to the pandemic, and he attends two classes per day. Ar. 41. His favorite subject is math and he likes sports. Ar. 42. He does not have many friends, but has one friend that he still talks to. Ar. 42. He gets along with his siblings and they do not fight. Ar. 43. He cleans his room and brushes his teeth, but he needs reminders and loses track of time. Ar. 43. He forgets and needs reminders to do his classes and schoolwork. Ar. 43-44.

MSJ at 7.

---

[8] He was 7 years old at the time the application was filed, but 9 years old by the time of the administrative hearing.

14

1

2      Even if accepted, much of this testimony would not necessarily satisfy the listing level

3 functional equivalence standard of marked limitations in 2 functional domains, or an extreme

4 limitation in at least 1 domain.  This is not only true of Claimant's above-quoted truncation of the

5 testimony in question, but is even more true in view of the actual testimony:

6

7     Q: Okay. Ms. Calderon, tell me why you feel what problems is [E.R.] having?
    A: Like a little bit, he's having a lot of problems with like doing his work. Getting

8     him to get on his classes. And like his first class in the morning is very, very short,
    and it's like I struggle just to get him on that. It's like he <u>sometimes like, he doesn't</u>

9     <u>even do his afternoon class, and all he has to do is two classes</u>.
        . . .

10     Q: Okay. Do you have recent report cards for [E.R.]?
    A: Recent ones? Yes, I do, but I don't have them with me.

11     Q: All right, can you tell me what they said?
    A: He has like, not completing, not completing. Most of it is like he doesn't complete

12     it, and I knew like his teacher, one of his teachers, his math teachers, he messages
    me daily. Like, I want to say 90 percent of every day, he'll skip a day or two, and

13     tells me how the day went with [E.R.], if he showed up or not. And he's like, <u>oh he</u>
    <u>has an F in this, or he didn't complete a topic, or you know</u>, he tells me everything,

14     but I don't have it with me<u>. So, I don't want to really say like exactly what it says</u>

15     <u>because I'm not too sure</u>, I was not there.
    Q: Okay, but you have all that written down, or you had these things that were

16     emailed to you by the teacher?
    A: Oh, yes. I have all that.

17     Q: All right, and you have his report cards as well?

18     A: Yes.
    ALJ: Mr. Martinez, do you have any of those things?

19     ATTY: <u>We have the most recent report card from Wonderful Prep in 17E</u>, that was
    the most recent.

20     ALJ: I saw that but that only gees from 17E, let me see what I have there, it was like

21     an incomplete, but do you have any of the other report cards?
    ATTY: I do not, no.

22     ALJ: Because I'm looking at this and it doesn't really tell me anything. Wait, wait,
    Ms. Calderon, wait. <u>I'm looking at 17E that does not tell me anything about grades</u>

23     <u>or anything of that nature</u>, and that's why I'm asking.

24     ATTY: Right.
    ALJ: <u>All it does is give me a class schedule, so that does not tell me how he's doing</u>,

25     or whether he's doing well, or not doing well. Do you have any report cards?
    Because in looking at the rest of this, I don't know that I saw any report cards in

26     there.
    ATTY: Yes, Your Honor, <u>I don't have any of the report cards. That was the only</u>

27     <u>information that she supplied</u>.

28     ALJ: <u>And as you saw, it doesn't really tell us anything, does it</u>?
    ATTY: correct.

ALJ: Okay, because in looking at the records at exhibit 2F, I have here back in May of '18, he was doing very well in school . . .

. . .

Q: Okay. Does he have frequent -- I noticed when you went to the Tulare Mental Health that you reported that he had problems such as acting out or getting in fights with his siblings, and just generally being disruptive. Have those outbursts gotten less frequent, are they about the same, but less intensity?

A: No, it's almost daily. Well really, he doesn't interact with the little ones, but it's like with the sisters it's every day.

Q: Okay. But did you notice any improvement with the medication?

A: Yeah, a little bit.

Q: Okay.

A: It's not like as bad as it was at first.

. . .

Q: Okay. And around the house, does he do any chores, or does he help out with the housework?

A: Nothing whatsoever. Like I can't get him to do nothing. It's like he gets mad and he'll like shut down. I can't get him to do anything. Like I really have to go and stand and grab him by his hand and be like, come on, you're going to do this, and like force him almost to do it.

Q Right. What kind of things de you try to get him to do?

A: Like, I'll be like come on let's clean up your room because his room gets cleaned daily. And then, by the time I go to work in the morning his room is clean. And then when I come back it looks like a tornado hit it you know, and I'll be like [E.R.] why did you do this? Oh, mom, this and it wasn't me. And then it's like, come on let's clean the room, and like okay, I will clean it, and then he'll go, and then I'll go in there and he'll just be sitting on the bed, and I'll be like [E.R.], you got to clean your room. And I'll have to stand there like come on, stand up, like following every little thing to do so he can do it because he won't do nothing.

Q: Okay, okay. Is there any kind of chore or any light stuff that he can do that he likes to do, like help you cook or something like that?

A He does like to, whenever I make meatballs, he likes to help me make meatballs do.  That's probably the only thing he'll voluntarily

Q: Okay, and when he's doing that, he can follow along with steps that you need to do to makes meatball?

A: I have to limit him. Like if I just let him like openly grab and stuff, no he won't, he'll just make all kinds of stuff like he'll go crazy. But I have to be like, this is yours right here, you know, his own little section of meat, and I'll be like get it and when you're done you ask me. And he'll be like, come on, come on, like anxious in a hurry, like he wants to hurry up and have me do everything how he did.

Q: I see. Okay. In the mornings, is he able to get himself ready for school at all, or do you have to do that for him?

A: No, I have to do that for him.

Q: Okay. Even like put on his clothes, and brush his teeth, or something like that?

A: So, yeah. I literally have to put his clothes on . . .

Q: Sure, understood. Okay, I see. Are there certain days he can do it, or is it just like an everyday thing that he just will refuse to do it?

A: It's mostly an everyday thing. I mean, he does have like a surprising, like a

16

shocking day for me, like mom I did this, and he feels good, you know. I'll be like oh dang, that's good [E.R.], you know, keep it up bud, and he gets like excited, and he'll go, okay? And then it's just again, he'll say but I don't want to.

AR 45-53 (emphasis added)[9]

Although the Claimant's mother testified that his math teacher writes her almost daily about him receiving failing grades, missing assignments, and/or missing class-- importantly she did not have a report card with her, could not produce one for her attorney, and her recollection was not sufficient for her to specifically confirm that he had in fact failed a class.  At the hearing they discussed Exhibit 17E, which upon closer inspection all agreed it was not in fact a report card but a schedule which did not show anything of substance, though as will be seen is not entirely correct. The first page was a student detail sheet which did contain a schedule among other things of no seeming importance.  However, the second page was an attendance report dated October 27, 2020, documenting his attendance for all 51 of 51 school days that elapsed between August 17, 2020 and October 26, 2020.  AR 307.  It notes zero absences during that period of time and only 1 tardy of less than 30 minutes occurring on October 26, 2020, which does not comport with the allegation that he routinely missed class or routinely had difficulty logging in on time.

In terms of chores, claimant's mother initially responded he does "nothing whatsoever", however she went onto explain that he does in fact do some things albeit with forceful encouragement and repeated prompting.  His room is clean when she leaves for work, though it looks like a tornado when she returns and he has to be forcefully prompted and closely monitored step by step to clean it again.  He helps her make meatballs though she must limit him and set aside his own little section of meat to work on lest he become impatient. It is debatable whether this testimony supports a claim of marked or extreme limitations in attending and completing tasks.

---

[9] Claimant's mother also testified (omitted above for brevity's sake) that the improvements with medication and therapy were minor and relatively shortly lived, which will be discussed in more detail below.

1

2
            As to Claimant's aggressiveness toward his sisters, his mother's testimony is fairly

3
consistent that this was an ongoing phenomenon notwithstanding medication and therapy.  Both

4
the Defendant and the ALJ emphasize the claimant's own statements to the contrary, namely that

5
he gets along with his sisters.  Claimant's point is well taken that his mother would be a more

6
reliable source of information concerning this.  However, Claimant's functioning with his peers is

7
an equally important indicator of overall social functioning, if not more so.  Ms. Sierra assessed his

8
social functioning as described above, which did not establish marked or extreme limitations in that

9
domain as a whole, notwithstanding that she scored individual activities as such.

10
            As to Claimant's self-care, or lack thereof, and the need for his mother to dress and groom

11
him for school, that relates to the fifth functional domain of "caring for yourself."   Although

12
Claimant highlights this testimony, perhaps for background/contextual purposes, in the statement

13
of his claim he "alleges disability due to functional equivalence to the childhood Listings as a result

14
of marked limitations in the domains of attending and completing tasks and interacting and relating

15

16
with others," but significantly does not allege marked limitations in the domain of caring for

17
yourself.  MSJ at 2.

18
            Claimant additionally takes issue with two of the ALJ's reasons for rejecting his mother's

19
testimony.  First, the ALJ noted that the claimant missed many therapy appointments suggesting

20
problems were not as severe as alleged.  Claimant's point is well taken that the claimant's missed

21
therapy appointments were not a valid reason given his mother's explanation that these missed

22
appointments were due to her inability to take time off during the probationary period of her new

23
job.  Defendant counters that "the record does not support that argument" because Claimant's missed

24
appointments spanned approximately one year from 2019 to 2020, indicating that Claimant's mother

25

26
cancelled or no-showed at Claimant's appointments repeatedly over a long period of time.  Resp. at 10.

27
Defendant seems to imply by this that a probationary period does not last 1 year, as if that were a widely

28

1
2
3
4

known fact.  However, there is no evidence concerning the duration of the  probationary period of

claimant's mother's new job, and thus no reason to discredit the explanation for missed therapy

appointments.

5
6
7

Finally, Claimant takes issue with the ALJ's repeated reliance on non-specific improvement

with medication despite evidence that his improvement was not consistently sustained. Claimant

notes:

8
9
10
11
12
13
14
15
16

> For example, mental status was intact and he was doing well in school on April 25,
> 2019 (Ar. 504), but on July 12, 2019, his mother reported he continued to be
> aggressive toward his siblings. Ar. 490. In October 2019, Dr. Singh increased
> Adderall due to rebound symptoms, noting ADHD was only partially controlled (Ar.
> 470-73), and therapy records documents significant problem behaviors. Ar. 361. He
> engaged in therapy due to aggression with other children, lying, impulsivity, anger,
> and failing grades. Ar. 361. Medications were again adjusted on November 4, 2019
> due to "rebound behavior" (Ar. 463-64), and his mother reported improvement in
> March 2020. Ar. 449. However, Claimant's status was again "worse" on May 21,
> 2020, and Dr. Singh noted a relapse of all symptoms including poor
> focus/concentration, disruptive and defiant behavior, and refusing to do work. Ar.
> 446. The ALJ's reference to partial, temporary improvement is not a clear and
> convincing reason for discounting the alleged intensity of his symptoms throughout
> the relevant period.

17
18
19
20
21
22
23

That Claimant's condition was only partially controlled at times, and that he had relapses

necessitating reevaluation and medication adjustments, does not establish marked or extreme

limitations.   Claimant frames the issue in a way that somewhat turns the burden of proof on its

head.  He contends his improved functional status was not consistently maintained given the periods

of poor functioning.  But that presupposes his baseline functioning was markedly or extremely

limited, which was not established.

24
25
26
27
28

Further, the ebb and flow of his functioning could just as easily be framed the inverse way:

his poor functional status was not consistent given the periods of improved functioning.  It is not

the ALJ's burden to establish continuously adequate functioning during the relevant period.  Rather,

it is the claimant's burden to establish the inverse: impairments causing marked or severe functional

limitations that have lasted or can be expected to last a continuous period of at least 12 months.  20

19

C.F.R. § 416.906.

Here, Claimant identifies no harmful error with respect to the ALJ's treatment of the testimony concerning the intensity, persistence and limiting affects of his symptoms. Finally, as the ALJ noted, medical expert C. Valette, PhD., reviewed the records concerning Claimant's ADHD and ODD and testified that he has no more than mild limitations in any areas of mental functioning except for a moderate limitation in concentration, persistence, and pace.  AR 26, 53–63.

**VII.    Conclusion**

The ALJ's finding that Claimant had less than marked limitations in the two functional domains at issue here was supported by substantial evidence, including: 1- Ms. Sierra's opinion which identified mean and median scores between 2.75 and 3.16 for the two domains at issue; 2- Ms. Sierra's reports that Claimant displayed improved focus and had less problems during recess following a medication increase (the first of three increases); and 3- the opinion of the medical expert, Dr. Valette.

**VIII.   Order**

For the reasons stated above, substantial evidence and applicable law support the ALJ's conclusion that Claimant was not disabled.  Accordingly, Claimant's appeal from the administrative decision of the Commissioner of Social Security is denied.  The Clerk of Court is directed to enter judgment in favor of Defendant Commissioner of Social Security and against Claimant E.R., a minor child by and through his guardian, Perla Calderon.

IT IS SO ORDERED.

Dated:    **April 28, 2024**              **/s/ Gary S. Austin**
                                  UNITED STATES MAGISTRATE JUDGE